IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN THE MATTER OF:

EDWARD F. SAGER, JR.,

C.A. N0. 14-4310

Bankruptcy No. 13-14660- SR

Advs No, 13-361

---

GEORGE P. STASEN, et al.

v.

EDWARD F. SAGER, et al.

C.A. NO. 14-4311

Bankruptcy No. 13-14660 SR

Advs No. 13-361

MEMORANDUM OPINION

SCHMEHL, J.

April /0 , 2015

Appellant George P. Stasen ("Stasen") appeals from the June 5, 2014 final summary
judgment Order of the Bankruptcy Court, denying his request for a determination of non-
dischargeability as to a $1.05 million judgment entered in his favor on December 2, 2011 in the
Court of Common Pleas of Bucks County (Judge Robert O. Baldi). The appellee/debtor Edward
F. Sager, Jr. ("Sager") filed a cross-appeal from the same final summary judgment Order of the
Bankruptcy Court which granted Stasen's request for a determination of nondischargeability as to
a $636,537.00 judgment entered against Sager on April 12, 2103 in the Court of Common Pleas
of Bucks County by Judge Baldi. For the reasons that follow, the ruling of the Bankruptcy Court

is reversed with respect to the determination of dischargeability as to the $1.05 million judgment and affirmed with respect to the determination of non-dischargeability as to the $635,537.00 judgment..[1]

District courts have appellate jurisdiction over final judgments, orders and decrees of a bankruptcy court pursuant to  28 U.S.C. § 158(a)(1). The Court reviews a bankruptcy court's findings of fact under a clearly erroneous standard and its conclusions of law under a *de novo* standard. In re Sub Micron Sys.Corp., 432 F.3d 448, 545 (3d Cir. 2006). A district court, sitting as an appellate tribunal, "may affirm, modify, or reverse a bankruptcy court's judgment, order, or decree or remand for further proceedings." Fed. R. Bankr. P. 8013.

The Court will first review the Bankruptcy Court's decision on the $1.05 million judgment.

The Bankruptcy Court noted that in making their respective arguments concerning the dischargeability of the $1.05 million debt, Stasen and Sager relied almost entirely on the findings of fact and conclusions of law set forth in, *inter alia,* Judge Baldi's December 2, 2011 Opinion and Order.  In that Opinion, Judge Baldi made the following Findings of Fact:

1. In April of 1995, George P. Stasen and Edward J. Sager formed the limited

---

[1]As an initial matter, Sager claims that the Bankruptcy Court erred in ruling on Stasen's Motion for Summary Judgment because the cover notice sheet provided under Local Rule 9014-3 was not included with Stasen's Motion for Summary Judgment. While the cover notice sheet was apparently not included, Sager fails to demonstrate how he was prejudiced by this *de minimis* oversight. Sager does not contend that he did not receive notice of Stasen's Motion for Summary Judgment. Indeed, it appears that Sager was served with a copy of the Motion both electronically and via mail. In addition, Sager even sought an extension to respond to the Motion for Summary Judgment which Stasen stipulated to. Sager then filed his Answer to Stasen's Motion for Summary judgment as well as his own Motion for Summary Judgment. As such, the Court can discern no error in the Bankruptcy Court ruling on both Motions for Summary Judgment.

2

partnership, Mentor Special Situation Fund, L.P. ("Fund") in order to form a venture capital business.

2. In addition, Stasen and Sager created Mentor Partners, L.P. ("MP"), a general partnership, which served as a general partner of the Fund. Stasen and Sager each held a fifty percent (50%) interest as a general partner.

3. Stasen and Sager also created Mentor Management Company, Inc. ("MMC") to provide management services to the Fund and its portfolio companies, and to receive fees for such services.

4. Mentor Capital Partners, Ltd. ("MCP") was also formed by Stasen and Sager in order to provide consulting services to the Fund and its portfolio companies, and to receive fees for such services.

5. On or around 2003, Stasen suffered financial difficulties, became insolvent and was no longer able to continue as a general partner in Mentor Partnership. Sager became the sole general partner and assumed responsibilities and control of the partnership. Thereafter, various disagreements developed between the two former partners.

6. In 2001, Stasen recorded a telephone conversation between himself and Sager.

7. In the recorded telephone conversation, Sager admits that he engaged in accounting and tax irregularities.

8. These "irregularities" included tax fraud. Sager admitted to Stasen then, and confirmed in Court, under oath, that he engaged in a pattern of behavior involving the filing of false tax returns.

9. As early as 1999 or 2000, Stasen became convinced that Sager was not allocating consulting fee income properly between himself and Stasen; that Sager was not accurately accounting for expenses, and that, as a result, he (Stasen) was being cheated by Sager.

10. Stasen began to make demands that Sager produce all books and records of their partnership for Stasen and/or Stasen's accountant's review.

11. No fewer than six such e-mailed or correspondence demands were introduced into evidence spanning from the year 2001 to the year 2006, approximately one such demand per year.

12. Sager, essentially, ignored these demands.

13. In April of 2006, Stasen believed there were irregularities in the financial records of the Fund and its associated entities due to certain actions of Sager.

3

14. In an effort to rectify the financial irregularities, Stasen requested the books and records from the Fund and its associated entities from Sager. Stasen asked that the review of the documents take place at the offices of a certified public accountant.

15. Sager delivered the requested documents to Harry Poulos ("Poulos"), a financial consultant who had a relationship with some of the Fund's limited partners, on April 25, 2006.

16. Thereafter, George Stasen and Edward Sager entered into settlement negotiations initiated by Edward Sager, and ultimately a settlement agreement was reached.

17. On April 25, 2006, a meeting between Sager and Stasen was held at Poulos' office. Poulos and Sager were present in Poulos' conference room. Due to his inability to attend, Stasen participated in the meeting by telephone. The meeting lasted approximately two (2) to three (3) hours.

18. During the meeting, Sager left the room and made telephone calls.

19. Sager had the opportunity to speak with an attorney before and during the settlement negotiations.

20. Eventually, a global settlement was reached between the parties concerning various matters. Poulos documented the terms and conditions of the agreement in a typed memorandum ("Memorandum of Understanding").

21. [The Memorandum of Understanding contained a number of terms and conditions which need not be repeated here.]

22. The Memorandum of Understanding goes on to say that "George wanted Ed to have his attorney draft a document immediately containing the terms and conditions." Since Sager was leaving for vacation in the near future, he indicated that he would like to wait until he returned the following weekend to have his attorney draft the document.

23. Sager then "agreed to prepare a hand written settlement before he left my [Poulos] office that day. He also agreed to immediately contact the attorney to begin work on the agreed upon document."

24. Sager handwrote and signed a memorandum memorializing the terms of the agreement. Sager's handwritten memorandum states the following:

a. "I agree to a settlement of $1,050,000 for resolving issues with George Stasen, Marvec Manufacturing [sic] Inc. and [sic] Michael

4

> Sexton. Documents pertaining to releases arising from the [sic]
> Edward Sager will be prepared by Sager's counsel. Settlement
> documents will also be prepared by Sager's counsel."

25. Sager confirmed that he agreed to all of the terms and conditions set forth in the Memorandum of Understanding and that this was an accurate recitation of the agreement between the parties.

26. Sager testified that he never intended the agreement to be binding. He only entered into the agreement "because [he] was trying to buy time to settle [his] tax delinquencies" and to somehow get Mr. Gary Bragg, Esquire whom he believed to be his attorney, involved in the matter.

27. Sager testified that he never viewed the terms of his handwritten settlement memorandum to be binding and that he never intended to settle the dispute; he only drafted the memorandum so his attorney, Bragg, would get involved.

28. In Court, Sager confirmed that he agreed to all of the above referenced terms and conditions and the Court finds that he did so with the intent to convince Stasen that an agreement had been reached.

29. Pursuant to the settlement agreement, Stasen is to receive $1,050,000.00 from Sager. The total sum is then to be disbursed by Stasen . . . .

30. In June of 2006, Sager demanded the return of the books and records previously provided and filed an action in replevin. At the same point in time, he indicated that he would not go through with the settlement agreement. Stasen did not look at the books and records after the parties agreed to settle the matter, because he thought all issues had been resolved.

31. Despite having entered into the agreement, Sager has refused to pay the money agreed upon and asked this Court to find that he was acting under duress and the settlement agreement should be considered unenforceable.

32. The Court finds Sager's portrayal of the circumstances surrounding the settlement agreement to be incredible, and rejects his characterization and version of the facts to the extent that they are in anyway inconsistent with this decision. His testimony before the Court was both shocking and appalling for someone who had been trusted to manage other people's money and investments. The Court specifically finds that Sager has engaged in a course of deceit and fraudulent conduct which has been motivated by greed and self-interest, and not duress.

33. This Court specifically finds that there was a dispute between the parties involving various matters, and that ultimately an agreement was reached, whereby money would

5

be paid to satisfy various obligations, to which Stasen had an interest, both directly and/or indirectly. Some of the matters involved business ventures and commitments made by other people which benefitted both Stasen and Sager and/or business ventures that they were involved in. As business men, their reputations were, and are, connected to those various ventures, and as such, it was reasonable and appropriate for Stasen to desire and request, as part of a global settlement, resolution of issues and claims made by third parties who Stasen believes were owed money. Payment of the settlement funds prior to the filing of this lawsuit would have benefitted both Stasen and Sager.

(ECF 3-3, pp. 1-8).

Judge Baldi then made the following Conclusions of Law:

34. "However improvident their agreement may be or subsequently prove for either party, their agreement, absent fraud, accident of mutual mistake, is the law of the case." [citations omitted].

35. Contract law governs the enforceability of settlement agreements [citations omitted].

36. An agreement to settle a dispute is strongly favored because it expedites the transfer of money to the complainant and reduces the burden on the courts. [citations omitted].

37. Courts will enforce a settlement agreement where all of the material terms are agreed upon. [citations omitted].

38. The court will enforce the terms of a settlement agreement, even if the terms are not in writing, when the agreement meets all of the requisites of a valid contract. [citation omitted].

39. A settlement agreement will not be set aside without a clear showing of fraud, duress, or mutual mistake. [citation omitted]. This Court finds, both as a fact and as a conclusion of law, that there was no showing of fraud, duress, or mutual mistake.

40. "An agreement will be considered sufficiently definite and enforceable if the parties intended to make a contract and there is a reasonably certain basis upon which the court can grant a proper remedy." [citations omitted].

41. In Pennsylvania, there are two types of legal duress: (1) civil; and (2) criminal. "Duress has been defined as that degree of restraint or danger, either actually inflicted or threatened and impending, which is sufficient in severity or apprehension to overcome the mind of a person of ordinary firmness." [citations omitted].

6

42. "The quality of firmness is assumed to exist in every person competent to contract, unless it appears by reason of old age or other sufficient cause he is weak or infirm." [citations omitted].

43. "Where person's deal with each other on equal terms and at arm's length, there is a presumption that the person alleging duress possesses ordinary firmness." [citations omitted].

44. Absent "threats of actual bodily harm there can be no duress where the contracting party is free to consult with counsel." [citations omitted].

45. Where a party had the opportunity to consult with counsel prior to "entering into a contract, that same party cannot later invalidate the contract by claiming economic duress" Economic duress does not exist "where the contracting party is free to come and go to consult with counsel before assuming new contractual obligations." [citation omitted].

46. The settlement agreement meets all of the legal requirements of a settlement and is a legally enforceable agreement between the parties.

47. Poulos prepared and memorialized the terms of the settlement agreement in the Memorandum of Understanding which the parties entered into on April 26, 2006.

48. All of the material terms of the settlement agreement were memorialized and agreed upon by the parties and reconfirmed through their testimony and sworn statements.

49. In addition to the Memorandum of Understanding, Sager prepared a handwritten memorandum, wherein he confirmed that he agreed, *inter alia*, to pay George Stasen ("Stasen") $1,050,000.00 in order to settle their various disputes and disagreements, and signed the document.

50. Sager had the opportunity to speak with counsel prior to and during the settlement negotiations.

51. Sager entered into an enforceable agreement to pay Stasen $1,050,000.00, which was not the product of duress or coercion. Sager's deceit should not and does not, as a matter of law, relieve him of the obligations to pay the money; this Court concludes he agreed to pay.

(ECF 3-3. Pp 8-11.)

As noted above, Stasen sought a ruling in bankruptcy that the $1,050,000.00 debt

was nondischargeable under 11 U.S.C. § 523(a)(2)(A). A debt may be excepted from discharge

7

under Section 523(a)(2)(A) if it was "for money, property or services, or an extension, renewal or refinancing of credit, to the extent it was obtained by false pretenses, false representations or actual fraud." The purposes of this exception are to distinguish the "honest debtor," who is entitled to a discharge from his or her debts and a fresh start under the Bankruptcy Code from a debtor who has committed fraud on his creditors, who does not merit a fresh start, and to protect creditors from fraud. See In re Cohen, 106 F.3d 52, 59 (3d Cir. 1997). Stasen has the burden of proof on the question of dischargeability and must meet it by a preponderance of the evidence. In re Cohn, 54 F.3d 1108, 1113 (3d Cir. 1995); Grogan v. Garner, 498 U.S. 279, 288-89 (1991).

The Bankruptcy Court ruled that the $1.05 million debt was dischargeable, finding that even if the debt had originated from Sager having committed or attempted to commit fraud, the settlement agreement rendered the debt solely a breach of contract claim. Specifically, the Bankruptcy Court stated:

> If the present dispute came down to the question of whether any Court ever found that Sager had committed fraud before entering into the Settlement Agreement, or attempted to commit fraud to evade the Settlement Agreement, Sager would clearly lose the issue. Stasen's dilemma, however, lies not in the fact of Sager having committed or attempted to commit fraud, but in the Court having found that whatever Sager's conduct had been, the parties reached a global settlement which put to rest any claims between them up to that time. . . The consequence of this is that Stasen now holds only a contract claim, and that he lacks a legally viable basis to contest the dischargeability of the $ 1.05 million judgment under 11 U.S.C. § 523. Accordingly, summary judgment as to this issue will be entered against Stasen and in favor of Sager.

(ECF 3-1, pp. 11, 13-14.)

Citing the United States Supreme Court's decision in Archer v. Warner, 538 U.S. 314 (2003), Stasen contends that the dispute does indeed come down to the question of whether the

8

original debt was for money obtained from Sager committing or attempting to commit fraud.

In Archer, the Archers sold a company they had purchased to the Warners. The Archers subsequently sued the Warners in state court for *inter alia*, fraud in connection with the sale. The parties settled the state court lawsuit and the Archers voluntarily dismissed the suit with prejudice. After the Warners failed to make the first payment under the terms of the settlement agreement, the Archers sued for the payment in state court. The Warners filed for bankruptcy. The Archers asked the Bankruptcy Court to find the debt nondischargeable because it was for money obtained by fraud. The Bankruptcy Court concluded that the debt was dischargeable and the District Court and Fourth Circuit Court of Appeals affirmed.

The Court of Appeals for the Fourth Circuit reasoned that the settlement agreement, releases and promissory note had worked a "kind of novation" and replaced an original potential debt to the Archers for money obtained by fraud with a new debt. The Court of Appeals further reasoned that since the new debt was not for money obtained by fraud, but rather was for money promised in a settlement contract, the debt was dischargeable in bankruptcy. After granting the Archer's petition for certiorari, the Supreme Court reversed.

According to the Supreme Court,

> "[T]he mere fact that a conscientious creditor has previously reduced his claim to judgment should not bar further inquiry into the true nature of the debt *Ibid*,; accord *Grogan v. Garner*, 498 U.S. 279, 290, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (assuming that the Bankruptcy Court seeks to "permit exception from discharge of all fraud claims creditors have successfully reduced to judgment.") If we substitute the word "settlement" for the word "judgment," the Court's statement describes this case.
>
> Finally, the Court's basic reasoning in *Brown* [*v. Flesen*, 442 U.S. 127 (1979)] applies here.

9

The Court pointed out that the Bankruptcy Code's nondischargeability provision had originally covered "only 'judgments' sounding in fraud." 442 U.S. at 138, 99 S.Ct. 2205. Congress later changed the language so that it covered all such "'liabilities.'" *Ibid.* This change indicated that "Congress intended the fullest possible inquiry" to ensure that "all debts arising out of" fraud are "excepted from discharge," no matter what their form. *Ibid.*; see also 11 U.S.C. 523(a)(current "any debt" language). Congress also intended to allow the relevant determination (whether a debt arises out of fraud) to take place in bankruptcy court, not to force it to occur earlier in state court at a time when nondischargeability concerns "are not directly in issue and neither party has a full incentive to litigate them." *Brown*, 442 U.S. at 134, 99 S.Ct. 2205."

Archer at 538 U.S. at 320-321.

In rejecting the Fourth Circuit's novation theory, the Supreme Court stated that "we conclude that the Archer's settlement agreement may have worked a kind of novation, but that fact does not bar the Archers from showing that the settlement debt arose out of 'false pretenses, a false representation, or actual fraud' and consequently is nondischargeable, 11 U.S.C. § 523(a)(2)(A)." Id. at 323.

The Supreme Court concluded that it made no difference that the debt in Archer was part of a settlement agreement whereas the debt in Brown originated in a stipulation and consent judgment. According to the Supreme Court "[a] debt embodied in the settlement agreement of a fraud case "'arises" no less "out of" the underlying fraud than a debt embodied in a stipulation and consent decree." Archer, 538 U.S. a t 321.

By concluding that the parties' global settlement "put to rest" any claims between them up to that time including any claims based on fraud, the Bankruptcy Court essentially followed the "novation" theory of the Court of Appeals for the Fourth Circuit in Archer which subsequently was rejected by the Supreme Court in Archer. Indeed, the Bankruptcy Court does

10

not discuss <u>Archer</u> in its Opinion. Its failure to do so was an abuse of discretion.

The Court finds that the tenets of <u>Archer</u> and <u>Brown</u>, compelled the Bankruptcy Court to inquire into the true nature of the settlement debt, and whether said debt arose out of "false pretenses, a false representation, or actual fraud" under 11 U.S.C. § 523(a)(2)(A). This is especially true here where Judge Baldi made numerous references to fraud on behalf of Sager in his Findings of Fact and where the Bankruptcy Court itself stated "[i]f the present dispute came down to the question of whether any Court ever found that Sager had committed fraud before entering into the Settlement Agreement, or attempted to commit fraud to evade the Settlement Agreement, Sager would clearly lose the issue. (ECF 31 at p. 11.) Accordingly, this issue will be remanded to the Bankruptcy Court so that it can make the appropriate analysis under 11 U.S.C. § 523(a)(2)(A).

The Court now turns to Sager's cross-appeal from the decision of the Bankruptcy Court that the $636,537.00 judgment entered against him by the Court of Common Pleas of Bucks County is nondischargeable The Bankruptcy Court determined that this debt was nondischargeable under 11 U.S.C. § 523(a)(4) and (a)(6). Sager appeals this determination.

With regard to this issue, the parties rely predominantly on the Findings of Fact and Conclusions of Law of Judge Baldi in his April 12, 2013 Opinion. Judge Baldi made the following Findings of Fact:

1. The parties agree that the number of units to be converted as a result of a general partners conversation to that of a limited partner is 15.51 units as of September 14, 2006.

2. The testimony of Christopher Nawn, CPA regarding the method for calculation of how to convert a General Partner's interest to that of a Limited Partner to the Partnership Agreement is uncontroverted.

11

3. Section 2.7 (a) of the Amended and Restated Partnership Agreement provides for the method for removal of a General Partner by vote of the limited partners.

4. Judge Heckler ruled that the removal of MENTOR PARTNERS, LP as General Partner was proper and the Superior Court affirmed his decision on February 14, 2008. The Superior Court also ruled that EDWARD F. SAGER, JR. should have been removed immediately.

5. Section 2.7(b)(I) of the Partnership Agreement provides the formula for calculation of the conversion of a former General Partner's interest to that of a Limited Partner.

6. The parties stipulated that the number of units which should be issued to MENTOR PARTNERS, LP, was 15.51 units effective September 14, 2006, the date of the vote.

7. GEORGE STASEN and EDWARD F. SAGER, JR. are each fifty (50%) percent owners of MENTOR PARTNERS, LP.

8. As of September 14, 2006, MENTOR PARTNERS, LP became a Limited Partner of MENTOR SPECIAL SITUATION FUND, LP.

9. Section 2.8 of the Partnership Agreement prohibits Limited Partners from having any authority to (I) manage or control the business of the Partnership, or (ii) to bind or act for the Partnership.

10. EDWARD F. SAGER, JR, testified that he knew that he was defying the will of the Limited Partners in refusing to withdraw through MENTOR PARTNERS, LP as General Partner of the Fund.

11. EDWARD F. SAGER, JR. admitted that he received $636,537 worth of fees for which he was not entitled.

12. GEORGE STASEN was elected as the General Partner, effective September 14, 2006, and this decision is supported by Judge Heckler's previous opinion, and the Superior Court decision which affirmed the removal of the former General Partner.

13.The Superior Court determined that a Stay should not have been granted and that MENTOR PARTNERS, LP should have been removed effective September 14, 2006.

14. EDWARD F. SAGER, JR. acknowledges that he defied the wishes of the Limited Partners by contesting the removal of MENTOR PARTNERS, LP.

15. When Judge Heckler entered his Order granting Injunctive Relief to Plaintiff Stasen, thereby ruling in favor of Plaintiff Stasen, he further took into consideration the Defendant's intent to appeal his decision and further granted the Defendants a stay of the Order, pending the

12

Appeal.

16. Thereafter, the stay was attacked by the Plaintiff; however, the stay was allowed to remain in effect pending the Appeal.

17. Following the issuance of the injunction which included a stay, Judge Heckler authored an exceptionally well-reasoned and thorough Decision for the Superior Court, in which he discusses the issuance of the stay. On page 21 of the Decision, Judge Heckler stated "Upon reflection, the undersigned concludes that it was error to grant the stay sought by the Appellants in this matter." However, thereafter, on the same page, he stated "Nonetheless, given the magnitude of the change that results from our validation of the vote of the limited partners, Appellants' claims merit the opportunity for careful consideration on appeal."

Judge Baldi then made the following Conclusions of Law:

In their final submissions to the Court, Plaintiffs request the Court to Order Defendant to return $636,537 in management fees acquired after the vote was taken, but before the Superior Court rendered its Decision. That request is being granted, in the Order which accompanies this Decision. The Defendant, in its submission, argues that the stay allowed the Defendant to remain as the General Partner of the Fund. That is true, in part: however, it was in violation of the written agreement that created the Fund and provided the authority of the General Partner. Under the terms of the Agreement, a vote was taken to remove the General Partner; however, the General Partner refused to leave in breach of the agreement. The General Partner's refusal to step down was at his/its own peril.

The "management fees" for this period of time are not simply the costs of overseeing a business. This sum of money represents a distribution of profit. It is not compensation based on an hourly rate for work performed. The term "management fee" is a term of art used by the promoters of the Fund to justify receiving the lion's share of the profits. The current General Partner was not able to take over the "management" of the Fund and take on the day to day operations, until after the Superior Court rendered its Decision. The management fees are to be returned to the Fund (not to the subsequent General Partner). To the extent the Fund owes a distribution to the Defendant, the Fund may withhold the distribution to the extent of the amount due for the return of management fees, plus interest.

Section 523(a)(4),(6) of the Bankruptcy Code states, in pertinent part:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt–

13

> **(4)** for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny;
> **(6)** for willful and malicious injury by the debtor to another entity or to the property of another entity

11 U.S.C.A. § 523(a)(4,(6). Again, Stasen has the burden of proof on the question of dischargeability and must meet it by a preponderance of the evidence. In re Cohn, 54 F.3d 1108, 1113 (3d Cir. 1995); Grogan v. Garner, 498 U.S. 279, 288-89 (1991).

With respect to the first method for dischargeability under § 523(a)(4), fraud and defalcation, the Bankruptcy Court correctly noted, "[t]o prevail under this prong of 523(a)(4) a plaintiff must prove that 1) the debtor was acting in a fiduciary capacity; and 2) while acting in that capacity the Debtor engaged in fraud or defalcation." Tyson v. Tyson, 450 B.R. 514, 522 (Bankr. E.D. Pa. 2011). In the context of § 523(a), fraud involves intentional deceit, rather than "implied or constructive fraud." E.g. In re Youngblood, 2009 WL 1232103, *10 (Bankr. S.D. Tex. Apr. 29, 2009); In re Tripp, 189 B.R. 29, 35 (N.D.N.Y. 1995).

The Bankruptcy Court then reviewed the record and concluded that Sager committed fraud or defalcation while acting in a fiduciary capacity. Specifically, the Bankruptcy Court stated:

> Sager was found by a court of competent jurisdiction to have engaged in tax fraud while in control of the Fund's operations. [citation omitted]. He was found to have knowingly defied the legitimate vote of the partnership to remove him, and to have done so in order to further his own interests and damage the Fund. [citation omitted]. Sued for this conduct Sager entered into a Settlement Agreement which he then disavowed. The disavowal of the Settlement Agreement was found to be deceitful, fraudulent, and motivated by greed and self-interest. Sager himself admitted fraud in connection with the Settlement Agreement, saying he only entered into it to "buy time." [citation omitted]. When other frivolous arguments of duress and extortion were rejected, and he was directed to abide by the Settlement Agreement, Sager took an appeal of the ruling which he later

14

acknowledged under oath to be baseless in fact and law. [citation omitted]. During the time the appeal was pending Sager acknowledged taking the $636,537 from the Fund. Finally Sager testified in open court, under oath, that he was not entitled to receive that money, but nevertheless took and retained it for himself. [citation omitted].

(ECF 3-1, pp. 17-18.)

There is no question that Sager, as the sole general partner of the limited partnership, owed a fiduciary duty to the limited partners. Alpart v. General Land Partners, Inc., 574 F.Supp. 2d 491, 500 (E.D.Pa. 2008), citing Jari Investments, L.P. v. Fleck, 937 A.2d 1113, 1123 (Pa.Super. 2007)("As a matter of social policy, general partners of a limited partnership owe a fiduciary duty to the limited partners.")

The Court agrees with Sager that many of the Bankruptcy Court's citations of fraud described above concerning tax fraud and fraud involving the Settlement Agreement are not relevant to the issue of whether Sager's action in taking the $636,537.00 was fraudulent. However, the Court finds that the Bankruptcy Court's citation to Judge Baldi's finding that Sager admitted, under oath, that he received $636,537.00, to which he was not entitled is more than enough to satisfy the fraud element of §523(a)(4), especially when combined with Judge Baldi's Findings that Sager testified that he knew he was defying the wishes of the Limited Partners by 1) refusing to withdraw as General Partner of the Fund and 2) by contesting the removal of Mentor Partners, LP

The Bankruptcy Court further found that the debt should not be discharged under the larceny and embezzlement prongs of § 523(a)(4). Citing Collier on Bankruptcy, the Bankruptcy Court stated the difference between embezzlement and larceny as follows:

15

Embezzlement is the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come. It differs from larceny in the fact that the original taking of the property was lawful, or with the consent of the owner, while in larceny the felonious intent must have existed at the time of the taking.

The required elements of embezzlement are: (1) appropriation of funds for the debtor's own benefit by fraudulent intent or deceit; (2) the deposit of the resulting funds in an account accessible only to the debtor; and (3) the disbursal or use of those funds without explanation of reason or purpose. For purposes of section 523(a)(4) it is improper to automatically assume embezzlement has occurred merely because property is missing, since it could be missing simply because of noncompliance with contractual terms.

Larceny is the fraudulent and wrongful taking and carrying away of the property of another with intent to convert the property to the taker's use without the consent of the owner. As distinguished from embezzlement, the original taking of the property must be unlawful. For purposes of section 523(a)(4), a bankruptcy court is not bound by the state law definition of larceny, but, rather, may follow federal common law, which defines larceny as a "'felónious taking of another's personal property with intent to convert it or deprive the owner of same..'"

In short, section 523(a)(4) excepts from discharge debts resulting from the fraudulent appropriation of another's property, whether the appropriation was unlawful at the outset, and therefore a larceny, or whether the appropriation took place unlawfully after the property was entrusted to the debtor's care, and therefore was an embezzlement.

(ECF 3-1, pp 19-20 citing 4 Collier on Bankruptcy ¶ 523.10[2] (16th ed.)

The Bankruptcy Court then stated:

The only question here is how one views the $636,537 at the time of its unlawful taking by Sager. If one posits that the monies went first into the Fund's account and were thereafter taken by Sager, the case for embezzlement would be made out. Conversely, if one posits that Sager took the funds before they ever made it into the Fund's account, then the case would be made out for larceny. Either way each would be a separate proven ground for a determination that the $636,537 is a non-dischargeable debt.

(ECF 3-1, p 20)

Judge Baldi noted that the Superior Court specifically found that Sager knew he was

16

defying the will of the Limited Partners in refusing to withdraw as General Partner of the Fund. Judge Baldi further noted that the Superior Court further found that Sager admitted that he unlawfully appropriated the funds to which he was not entitled. Therefore, the only question left to be resolved was indeed when did Sager unlawfully appropriate the funds. As noted by the Bankruptcy Court, if Sager took the money after it first went into the Fund's account, then the elements for embezzlement have been satisfied. If Sager took the money before it was deposited into the Fund, then the elements for larceny have been established. In any event, the Bankruptcy Court properly concluded the debt should not be discharged under the fraud, embezzlement and larceny exceptions in section 523(a)(4).

The Bankruptcy Court also found that the debt was nondischargeable under Section 523(a)(6) which excepts from discharge any debt for "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). Since this Court has already concluded that the Bankruptcy Court properly found that the $636,537 debt was nondischargeable under § 523(a)(4), the Court need not consider whether the debt is nondischargeable under § 523(a)(6).

An appropriate Order follows.

17